UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL JACOBS,

      Petitioner,

    v.

ROBERT W. FOX, Warden,

      Respondent.

Case No. 15-cv-05046-YGR (PR)

**ORDER GRANTING RESPONDENT'S RENEWED MOTION TO DISMISS PETITION AS UNTIMELY; AND DENYING CERTIFICATE OF APPEALABILITY**

## I. INTRODUCTION

Petitioner Michael Jacobs, a state prisoner, filed the instant *pro se* action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Before the Court is Respondent's renewed motion to dismiss the instant petition as untimely under 28 U.S.C. § 2244(d)—the statute of limitations established by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Dkt. 30. Although he was given the opportunity to do so, Petitioner did not file an opposition to the motion.

Having read and considered the papers submitted and being fully informed, the Court GRANTS Respondent's renewed motion and dismisses the petition.

## II. BACKGROUND

As discussed in the Court's January 25, 2017 Order denying Respondent's previously-filed motion to dismiss, the following procedural background is undisputed:

> The Alameda County District Attorney charged Petitioner with six counts stemming from the 1999 robberies, theft and attempted robbery of several different older women. Resp't Ex. 1 at 1. Three of the charges carried enhancements alleging that the victim was 65 years of age or older (Cal. Penal Code § 667.9(a). *Id.* The amended information also alleged six prior convictions. *Id.* Petitioner confessed to the crimes when he was arrested. *Id.*
>
> An Alameda County jury was sworn on December 6, 2001, but five days later, on December 11, 2001, Petitioner entered a plea of no contest to all six counts and admitted the enhancements and the six prior convictions. *Id.* 1-2. There was no agreement as to sentence. *Id.* at 2. After denying a motion to dismiss the prior strikes pursuant to *People v. Superior Court (Romero)*, 13 Cal. 4th 497 (1996), the court sentenced Petitioner under California's Three Strikes law to five consecutive terms of 25 years to life and one

concurrent term of 25 years to life. *Id.* The court imposed additional terms for the enhancements, computed custody credits and imposed two fines. *Id.* The total prison term was 131 years 8 months to life. *Id.*

On August 7, 2003, the California Court of Appeal affirmed the judgment of conviction, and ordered clerical and calculation errors to be corrected on the abstract of judgment. Resp't Ex. 1 at 6-8. On October 22, 2003, the California Supreme Court denied review. Resp't Ex. 2.

In 2004, Petitioner filed two habeas petitions in Alameda County Superior Court. Resp't Ex. 3. The state superior court consolidated the petitions on August 10, 2004, and denied both on October 12, 2004. *Id.*

On November 8, 2004, Petitioner filed a habeas petition in the California Court of Appeal, which was denied on November 17, 2004. Resp't Ex. 4.

On December 3, 2004, Petitioner filed a habeas petition in the California Supreme Court, which was denied on October 12, 2005. Resp't Ex. 5.

On October 21, 2015, Petitioner filed the current petition in this Court. Dkt. 1.[1]

Dkt. 26 at 1-2 (footnote in original).

On April 14, 2016, the Court issued an order to show cause. Dkt. 17. On June 13, 2016, in lieu of an answer, Respondent moved to dismiss the petition as untimely. Dkt. 20. In lieu of filing an opposition to the motion, Petitioner filed a request for a stay and abeyance of his federal habeas proceedings. Dkt. 22. Respondent filed an opposition to Petitioner's request for a stay and abeyance. Dkt. 24.

On January 25, 2017, the Court issued an order denying Petitioner's request for a stay and abeyance because he had failed to provide any allegations from which the Court could determine good cause for a stay. Dkt. 26 at 8-10. The denial was without prejudice to filing a renewed

---

[1] Petitioner neither signed his federal petition nor specified the date on which he submitted it to prison authorities for filing. Therefore, without such information, the Court deems it filed on October 21, 2015, the date of filing. *Cf. Saffold v. Newland*, 250 F.3d 1262, 1268 (9th Cir. 2001), *vacated and remanded on other grounds*, *Carey v. Saffold*, 536 U.S. 214 (2002) (holding that a federal or state habeas petition is deemed filed on the date the prisoner submits it to prison authorities for filing, rather than on the date it is received by the court). On March 16, 2016, Petitioner complied with the Clerk of the Court's directions to provide a signed copy of the petition. Dkt. 15.

motion for a stay so that he may show how he satisfies the *Rhines*[2] criteria or complies with the

*King/Kelly*[3] requirements. *Id.* at 9-10. Also in the January 25, 2017 Order, the Court found that

"the instant federal habeas petition filed on October 21, 2015 [was] . . . untimely by nine years

unless equitable tolling applie[d]."[4] Dkt. 26 at 5. The Court noted that Petitioner "ha[d] presented

allegations in a verified affidavit that he [was] "visually impaired, and ha[d] been subjected to

great difficulty obtaining any type of assistance from the [California Department of Corrections of

Rehabilitation ("CDCR")] or their official[s]." *Id.* at 6 (citing Dkt. 22 at 1). The Court further

found that "Petitioner's physical ailment, i.e., his blindness, and the aforementioned lack of legal

assistance from the CDCR could constitute extraordinary circumstances sufficient to warrant

equitable tolling." *Id.* at 6. However, the Court determined that "Respondent ha[d] not

sufficiently addressed whether Petitioner is entitled to equitable tolling based on such allegations."

*Id.* Consequently, the Court denied the motion to dismiss the petition as untimely, without

prejudice to Respondent's renewing the motion and addressing equitable tolling. *Id.* at 7.

Petitioner did not file a renewed request for a stay or abeyance. Meanwhile, in the instant

renewed motion to dismiss filed on April 14, 2017, Respondent renews the argument that all of the

claims in the petition are untimely and addresses the matter of equitable tolling. Dkt. 30 at 3-29.

In support of his renewed motion to dismiss, Respondent lodged Exhibit A, a compilation of

Petitioner's comprehensive medical records from 2002 through 2016. Dkt. 30, Resp't Ex. A.

---

[2] A stay under *Rhines*, "is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court," the claims are not meritless, and there are no intentionally dilatory litigation tactics by the petitioner. *Rhines v. Weber*, 544 U.S. 269, 277-278 (2005).

[3] A *King/Kelly* stay provides an alternative method of addressing cases where a petitioner has some unexhausted claims he desires to present in his federal habeas action. Under the procedure outlined in *Kelly v. Small*, 315 F.3d 1063 (9th Cir. 2003), *overruled on other grounds by Robbins v. Carey*, 481 F.3d 1143 (9th Cir. 2007), "(1) a petitioner amends his petition to delete any unexhausted claims; (2) the court stays and holds in abeyance the amended, fully exhausted petition, allowing the petitioner the opportunity to proceed to state court to exhaust the deleted claims; and (3) the petitioner later amends his petition and re-attaches the newly-exhausted claims to the original petition." *King v. Ryan*, 564 F.3d 1133, 1135 (9th Cir. 2009) (citing *Kelly*, 315 F.3d at 1070-71).

[4] The Court previously found that statutory tolling was not sufficient to overcome the time bar to Petitioner's federal habeas petition. Dkt. 26 at 4-5.

1    Respondent has also included records relevant to Petitioner's mobility and alleged inability to

2    access prison resources. *See* Resp't Ex. B-D. Respondent points out that Petitioner's medical

3    records demonstrate that he was not diagnosed as blind until June 2010, and that "[a]lthough

4    [P]etitioner had vision problems prior to that date due to his progressive diabetes, for which he

5    often refused treatment, the records do not show that he had significant or sustained vision loss

6    prior to the fall of 2009." *Id.* at 6. Respondent specifically summarizes Petitioner's vision-related

7    medical records, *see id.* at 6-29, and claims that these records "do not indicate that [Petitioner] was

8    blind or significantly vision impaired from October 2005 to October 2006, the year after which his

9    state judgment became final." *Id.* at 6. Respondent further alleges that "the records demonstrate

10   that the ten-year period between the date on which the statute of limitations began to run and the

11   date on which Petitioner filed his petition (October 12, 2005 to October 21, 2015) contained

12   significant spans of time in which Petitioner was able to effectively advocate for himself and

13   access prison resources." *Id.* Respondent concludes by stating that "[s]ince Petitioner cannot

14   demonstrate that blindness prevented him from timely filing his petition, or that he diligently

15   pursued his rights despite his worsening vision, he cannot demonstrate that he is entitled to

16   equitable tolling." *Id.* at 29.

17   Petitioner's opposition was due on May 12, 2017. However, to date, Petitioner has neither

18   filed his opposition nor a motion requesting an extension of time to do so.

19   **III.    DISCUSSION**

20   **A.    Overview**

21   AEDPA, effective April 24, 1996, imposes a limitations period on petitions for a writ of

22   habeas corpus filed by state prisoners. A state prisoner with a conviction finalized after April 24,

23   1996, such as Petitioner, must satisfy the AEDPA statute of limitations. *See Calderon v. United*

24   *States Dist. Court (Beeler)*, 128 F.3d 1283, 1286 (9th Cir. 1997), *overruled in part on other*

25   *grounds by Calderon v. United States Dist. Court (Kelly)*, 163 F.3d 530 (9th Cir. 1998) (en banc).

26   In prisoner actions challenging non-capital state convictions or sentences, a habeas petition

27   must be filed within one year of, inter alia, the date the judgment became final after the conclusion

28   of direct review or the time passed for seeking direct review. 28 U.S.C. § 2244(d)(1). "Direct

4

review" includes the ninety-day period during which a criminal appellant can file a petition for a writ of certiorari from the United States Supreme Court, whether he or she actually files such a petition or not. *Bowen v. Roe*, 188 F.3d 1157, 1159 (9th Cir. 1999). Accordingly, if a petitioner fails to seek a writ of certiorari from the United States Supreme Court, the AEDPA's one-year limitations period begins to run on the date the 90-day period defined by Supreme Court Rule 13 expires. *See Miranda v. Castro*, 292 F.3d 1063, 1065 (9th Cir. 2002). The one-year period is calculated according to the general rule for counting time in federal courts, Rule 6(a) of the Federal Rules of Civil Procedure. *Patterson v. Stewart*, 251 F.3d 1243, 1246 (9th Cir. 2001). That is, "the day of the act, event, or default from which the designated period of time begins to run shall not be included" in the one-year limitations period. Fed. R. Civ. P. 6(a). This is referred to as the "anniversary method" because, absent any tolling, the expiration date of the limitations period will be the same date as the triggering event in the following year. *Patterson*, 251 F.3d at 1246.

As a threshold matter, once a petitioner is notified that his petition is subject to dismissal based on the AEDPA's statute of limitations and the record indicates that the petition falls outside the one-year time period, he bears the burden of demonstrating that the limitations period was sufficiently tolled under statutory and/or equitable principles. *See Smith v. Duncan*, 297 F.3d 809, 814 (9th Cir. 2002) *overruled on other grounds by Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005).

In the present case, the California Supreme Court denied review on October 22, 2003. The judgment became final for purposes of the AEDPA statute of limitations ninety days later, on January 20, 2004. *See id.* The one-year limitations period, therefore, began to run on that date. Accordingly, Petitioner had until January 20, 2005 to file his federal petition. *See* 28 U.S.C. § 2244(d). Because he did not file the present petition until October 21, 2015—more than ten years after the limitations period had expired—it is untimely unless Petitioner can show that he is entitled to tolling.

As mentioned above, the Court previously found that the time bar to Petitioner's federal habeas petition could not be overcome by statutory tolling. Dkt. 26 at 4-5. AEDPA's one-year

limitation period is tolled under § 2244(d)(2) for the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2)). This includes the time between a lower state court's decision and the filing of a notice of appeal to a higher state court. *Carey v. Saffold*, 536 U.S. 214, 219-221 (2002). In California, where prisoners generally use the state's "'original writ' system," this means that the limitation period remains tolled during the intervals between a state court's disposition of an original state habeas petition and the filing of a further original state habeas petition in a higher court, provided the prisoner did not delay unreasonably in seeking review in the higher court. *See id.* at 220-23.

After *Carey*, a state habeas petition is pending "[i]n the absence of undue delay," while a California petitioner "complete[s] a full round of [state] collateral review" all the way to the California Supreme Court. *Biggs v. Duncan*, 339 F.3d 1045, 1048 (9th Cir. 2003) (citation and internal quotations marks omitted). But if there is any gap between the completion of one round of review and the commencement of another round of state habeas review, the petitioner is not entitled to tolling during the gap. *See id.* at 1046-47, 1048; *see also Dils v. Small*, 260 F.3d 984, 986 (9th Cir. 2001) (not tolling limitation period during gap between successive state habeas petitions filed in the same court).

Here, the Court did not have the proper information necessary to calculate the exact statutory tolling to which Petitioner was entitled, but determined that the time bar to his federal habeas petition could not be even if he were entitled to statutory tolling the entire time he completed a full round of state collateral review, stating as follows:

> After Petitioner's process of direct review came to an end on October 22, 2003, Petitioner filed two habeas petitions in the Alameda County Superior Court, and Respondent correctly notes that the record does not indicate the exact dates on which these petitions were filed. Therefore, Respondent assumes that the earliest date Petitioner could have filed his state superior court habeas petitions would have been January 20, 2004, the end of the ninety-day period during which he could have filed a petition for a writ of certiorari. Under *Carey* and its progeny, the one-year limitation period could be tolled under section 2244(d)(2) until the California Supreme Court denied Petitioner's round of state habeas review on October 12, 2005. After the California Supreme Court denied Petitioner's habeas petition on October 12, 2005, Petitioner had 365

1
2
3

days to file a federal habeas petition on time. If Petitioner were entitled to statutory tolling the entire time he completed a full round of state collateral review, then he should have filed his federal habeas petition by *October 12, 2006*. However, the instant federal habeas petition filed on October 21, 2015 is still untimely by nine years unless equitable tolling applies.

4   Dkt. 26 at 4-5 (emphasis added). Therefore, because Petitioner did not file the present petition

5   until October 21, 2015—nine years after the limitations period had expired on October 12, 2006—

6   it is untimely unless Petitioner can show that he is entitled to equitable tolling.

7       **B.    Standard for Equitable Tolling**

8           The Supreme Court has determined that AEDPA's statute of limitations is subject to

9   equitable tolling in appropriate cases. *Holland v. Florida*, 560 U.S. 631, 645 (2010). "When

10  external forces, rather than a petitioner's lack of diligence, account for the failure to file a timely

11  claim, equitable tolling of the statute of limitations may be appropriate." *Miles v. Prunty*, 187

12  F.3d 1104, 1107 (9th Cir. 1999). However, equitable tolling is unavailable in most cases because

13  extensions of time should be granted only if "'extraordinary circumstances' beyond a prisoner's

14  control make it impossible to file a petition on time." *See Calderon v. United States Dist. Court

15  (Beeler)*, 128 F.3d 1283, 1288 (9th Cir. 1997) (citation omitted), *overruled in part on other

16  grounds by Calderon v. United States Dist. Court (Kelly)*, 163 F.3d 530 (9th Cir. 1998) (en banc).

17  The party seeking equitable tolling bears the burden of establishing two elements: "(1) that he has

18  been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his

19  way," preventing timely filing. *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). "[T]he threshold

20  necessary to trigger equitable tolling [under AEDPA] is very high, lest the exceptions swallow the

21  rule." *Id.* at 1066 (internal quotations and citation omitted). At the same time, "[r]ather than let

22  procedural uncertainties unreasonably snuff out a constitutional claim, the issue of when grave

23  difficulty merges literally into 'impossibility' should be resolved in [a petitioner's] favor." *Lott v.

24  Mueller*, 304 F.3d 918, 920 (9th Cir. 2002). When a prisoner is proceeding *pro se*, his allegations

25  regarding diligence in filing a federal petition on time must be construed liberally. *Roy v.

26  Lampert*, 465 F.3d 964, 970 (9th Cir. 2006).

27      **C.    Analysis**

28          As mentioned above, the Court has found that the instant federal petition filed on October

7

21, 2015 is untimely by nine years. Petitioner could be entitled to equitable tolling if his untimeliness was caused by extraordinary circumstances beyond his control. Specifically, his alleged blindness could have contributed to his failure to file his federal habeas during the relevant time-frame: between October 12, 2005 (the date statutory tolling would have ended and the limitations period would have begun to run again) and October 12, 2006 (the expiration of the limitations period). *See id.*

In its January 25, 2017 Order, the Court cited to *Laws v. Lamarque*, 351 F.3d 919, 922-24 (9th Cir. 2003) regarding the showing necessary to establish a tolling claim based on his alleged blindness. Dkt. 26 at 6. Based on *Laws*, a petitioner is required to make an initial showing that he suffered from a mental illness—or in this situation a physical ailment, like blindness—sufficiently severe to warrant equitable tolling. If a petitioner makes an initial showing of severe mental illness (or physical ailment), a district court must take care not to deny a claim for equitable tolling before a sufficient record can be developed. *Laws*, 351 F.3d at 924. Once the record has been sufficiently developed, the district court may dismiss a claim of equitable tolling based on severe mental illness (or physical ailment) if it finds there is sufficient "countervailing evidence" that rebuts the claim. *Id.*

### 1. Summary of Petitioner's Relevant Medical Records

In support of their renewed motion to dismiss, Respondent has obtained a certified copy of Petitioner's medical records for the entire relevant time period at issue, from 2002 through 2016, which has been summarized in their motion in chronological order by year. Dkt. 30 at 7-23. Petitioner, who has not filed an opposition to the motion, has not submitted any further medical records that describe his alleged blindness or an inability on his part to conduct his affairs or prepare legal work. The Court finds that Respondent's summary of Petitioner's medical records is undisputed, as Petitioner has failed to file any opposition. Therefore, the Court adopts Respondent's chronological summary, and includes the relevant portions below. As mentioned above, Respondent points out that Petitioner's medical records demonstrate that he was not diagnosed as blind until June 2010. Although Petitioner had vision problems prior to that date due to his progressive diabetes, the summary below indicates that the medical records do not show that

8

he had significant or sustained vision loss prior to the fall of 2009.  The Court also adopts Respondent's records relevant to Petitioner's mobility and alleged inability to access prison resources.

### a.    2002-2004

In April and May 2002, Petitioner self-identified to prison staff as "vision impaired," claimed he had "partial" blindness in his left eye, and indicated he was mobility impaired.  Resp't Ex. A at 1585, 1589, 3794-3795, 3934.  In late April 2002, Petitioner was housed in a lower bunk due to a left ankle problem, effective for thirty days.  *Id.*  Around that time, a social worker noted Petitioner did not need adaptive support because he "has high cognitive test scores[.]"  *Id.* at 2547 2548.  Also in late April 2002, Petitioner was seen for pain after surgery on a fractured left hip, and permitted a walking cane and walking restrictions for six months.  *Id.* at 1590.

In November 2002, Petitioner told a doctor he was "totally blind" in his left eye and "partial[ly] blind" in his right eye.  *Id.* at 1219.  The doctor referred Petitioner to optometry and noted there was "<u>No</u> objective documentation" for such allegations "despite [being] issued a[n] 1845 [chrono[5]]."  *Id.*  That same month, Petitioner had an orthopedic consultation for alleged immobility due to a 1998 hip dislocation.  *Id.* at 2305.  The doctor said he could not justify a duty restriction because Petitioner "walk[ed] easily without a cane, [was] able to fully squat and recover, and arise from sitting with no effort."  *Id.*

On November 27, 2002, Petitioner again self-identified as "Blind/Vision Impaired" and "Mobility Impaired."  *Id.* at 1580.  A medical professional noted that Petitioner was "alleged blind due to diabetes,[6] hip displaced, 1845 [chrono] fr[om] [San Quentin State Prison ('SQSP')] but no clinical or objective evaluation or documentation[.]"  *Id.*  About two weeks later, Petitioner refused to see an optometrist for an appointment.  *Id.* at 1216, 2304.

On May 19, 2004, Petitioner had a follow-up for chest pain he experienced a month prior.

---

[5]  A "chrono" is a CDCR form that documents information about inmates.  An 1845 chrono documents an inmate's disability.

[6]  Petitioner claimed that he was "diagnosed with diabetes . . . at 15."  Resp't Ex. A at 3009.

*Id.* at 1200.  Petitioner said he had not had "chest pain since that one day when I played 8 games of basketball straight—and I think I overdid it." *Id.*  In August 2004, Petitioner was exercising and running every morning. *Id.* at 1197.  Also in August 2004, Petitioner was referred to optometry with a diagnosis of "diabetic retinopathy."[7] *Id.* at 2301.  The referring doctor noted Petitioner's "VA" or visual acuity (the clarity or sharpness of vision) was "still good." *Id.*

In late September 2004, Petitioner was called in for an "ophthalmologic examination" due to an "eye complaint." *Id.* at 2297.  The doctor noted a diagnosis of "proliferative retinopathy"[8] and made further medical referrals. *Id.*

In late December 2004, an interdisciplinary progress note indicated that Petitioner was "waiting for [an offsite] retinologist app[ointment] in Vacaville." *Id.* at 3003.  Petitioner said he was "fighting his 3 strikes," going to the yard every day, working out, and "jog[ging]." *Id.*

### b.     2005-2007

On April 22, 2005, Petitioner was issued a rule violation for drug trafficking at Mule Creek State Prison.[9]  Resp't Ex. B, Rules Violations Report, Dkt. 30-20 at 4.  In preparation for his

---

[7] According to the Mayo Clinic, diabetic retinopathy is a "diabetes complication that affects eyes . . . caused by damage to the blood vessels of the light-sensitive tissue at the back of the eye (retina).  At first, diabetic retinopathy may cause no symptoms or only mild vision problems.  Eventually, it can cause blindness."  Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/diabetic-retinopathy/basics/definition/con-20023311 (last visited Nov. 28, 2016).

[8] According to the American Optometric Association, proliferative diabetic retinopathy is:

. . . the more advanced form diabetic retinopathy.  At this stage, circulation problems deprive the retina of oxygen.  As a result new, fragile blood vessels can begin to grow in the retina and into the vitreous, the gel-like fluid that fills the back of the eye.  The new blood vessels may leak blood into the vitreous, clouding vision.

*See* American Optometric Association, https://www.aoa.org/patients-and-public/eye-and-vision-problems/glossary-of-eye-and-vision-conditions/diabetic-retinopathy (last visited Nov. 28, 2012).

[9] The rules violation report detailed that Petitioner was the "largest drug dealer" of narcotics in the yard, and "one of the top three drug dealers" of heroin and marijuana.  Resp't Ex. B, Rules Violations Report, Dkt. 30-20 at 5.  An informant "related that [Petitioner] swallows the drugs in the visiting room then brings them on the yard for the purpose of distribution/sales." *Id.* The report further explained that a prison officer had searched Petitioner's cell on April 10, 2005 and found expired prescription pills with Petitioner's name on them in plastic bags. *Id.*  The pills appeared to have been "cheeked (Hidden in the mouth to make it appear that they were swallowed) as they were partially dissolved." *Id.* at 6.  A urine sample taken from Petitioner on

disciplinary hearing on May 29, 2005, Petitioner stated "he **DOES NOT** have a disability (vision/hearing) and **DOES NOT** require staff assistance, i.e. written hearing or sign language interpreter." *Id.* at 8 (emphasis in original). Petitioner stated he was guilty of possessing expired prescribed medication but not trafficking drugs. *Id.* at 9. Petitioner said the cocaine in his system "could have been do [sic] to the combination of all [his] prescription medications," and said he "cheeked" the pills so he could avoid pill call on some days. *Id.* On November 10, 2005, the Amador County District Attorney filed a criminal complaint charging Petitioner with possessing drugs in prison. Resp't Ex. C at 1.

In late December 2005, Petitioner told his social worker that he was doing well in his GED classes and anticipated he could complete his GED if he could stay one more quarter. Resp't Ex. A at 2908. On December 27, 2005, a medical professional noted that Petitioner had hurt his shoulder throwing a football in February 2005, but he had "stable ambulation." *Id.* at 1164. On December 27, 2005, Petitioner had a "chronic care" follow-up visit. *Id.* at 1163. The report listed Petitioner's "chronic diseases" as "DM" or diabetes mellitus (commonly referred to as diabetes) and "HTN" or hypertension (high blood pressure).[10] *Id.*

On February 9, 2006, Petitioner told his social worker that he had just had a court appearance related to having had a controlled substance some months ago. *Id.* at 2888. In mid-February 2006, Petitioner's mobility was assessed after he reported right shoulder pain due to throwing a football ten months prior. *Id.* at 1157-1158. The doctor noted that Petitioner had physical immobility due to right shoulder pain, and was "unable to tuck shirt in or throw ball," but he did not note vision impairment or any other source of immobility. *Id.* at 1157.

In March 2006, Petitioner's doctor requested that he see optometry for a routine eye exam. *Id.* at 2265.

On April 7, 2006, Petitioner told his social worker, "I got charged with having a controlled

---

April 22, 2005 tested positive for cocaine. *Id.* at 6-7.

[10] As explained below, it was not until June 27, 2010 that Petitioner's chronic care follow-up visit reports noted that his "chronic diseases" also included "visual impairment." *See* Resp't Ex. A at 1034.

substance for sale/distribution. I could get twenty-five to life! So all I can do is pray about it. I go to court next Friday." *Id.* at 2865. On April 14, 2006, Petitioner reported that he was "more depressed" because he attended court that morning and received an additional sentence of twenty five-years-to-life. He said he would still fight to have his initial sentence reduced, but believed the issue to be "moot" due to the additional sentence. *Id.* at 2863.[11]

In late May 2006, Petitioner had a follow-up for his chronic conditions. *Id.* at 3696. The doctor noted that Petitioner's "chronic diseases" were diabetes and hypertension, but did not note any blindness or vision impairment. *Id.*

In mid June 2006, Petitioner told his social worker that he wanted to stay in school after his next transfer, and reported success in his GED classes. *Id.* at 2835.

On July 5, 2006, Petitioner told his social worker he was upset because he just found out he lost his appeal in federal court. *Id.* at 2830. Two days later, Petitioner said he lost his appeal in the Supreme Court. *Id.* at 2827.[12] Petitioner said he was attending his classes most of the time, *id.*, and attended GED school "all day" in July. *Id.* at 2826, 2822.

On July 12, 2006, a doctor classified Petitioner's diabetes as "high risk." *Id.* at 2821. On July 26, 2006, Petitioner reported that he was experiencing loss of vision. *Id.* at 3667. On July 27, Petitioner reported, "There's something leaking in my eyes," and "I am worried about my eyesight." *Id.* at 2819. Petitioner was examined by ophthalmology that day. *Id.* at 3667. The next day, Petitioner's doctor requested an urgent consultation with a retinologist, noting Petitioner had a background of diabetic retinopathy. *Id.* at 2245.

In early August 2006, Petitioner reported that he thought his diabetes was stabilizing. *Id.* at 2818. Apparently still in school, Petitioner said he had missed some school days. *Id.*

On September 9, 2006, an interdisciplinary progress note indicated that Petitioner

---

[11]  The record shows that Petitioner pleaded guilty to possessing drugs in a prison facility on April 14, 2006, and he was given a consecutive six-year sentence. *See* Resp't Ex. D.

[12]  There is nothing in the record indicating what "appeal in federal court" Petitioner was referring to. Also, the California Supreme Court denied Petitioner's habeas petition on October 12, 2005. Dkt. 20-1 at 21. It is unclear if Petitioner misstated the name of the court or if his social worker incorrectly summarized his concerns.

1  complained of a kidney infection. *Id.* at 2807. The note did not indicate any complaints about

2  eyesight. *Id.* A "high risk" follow-up visit also dated on September 9, 2006, indicated that

3  Petitioner had diabetes and hypertension, but did not note eyesight problems. *Id.* at 3658.

4  In November 2006, Petitioner appears to have refused a scheduled appointment with a

5  retinologist. *Id.* at 2245.

6  In mid-December 2006, Petitioner again refused a retinologist appointment. *Id.* at 2245,

7  2232.

8  On February 1, 2007, at a "high-risk" follow up visit, the evaluator indicated that Petitioner

9  had high-risk diabetes and hypertension, and that he was exercising once a day, including doing

10  pushups. *Id.* at 3691.

11  In March 2007, during a chronic-care follow up visit, Petitioner's only noted

12  "complaints/problems" were hypertension. *Id.* at 3690. A "problem list" completed on May 16,

13  2007 did not note blindness or vision problems, but noted hypercholesterolemia (high cholesterol),

14  hypertension, bipolar, depression, IDDM,[13] and GERD.[14] *Id.* at 6.

15  On December 13, 2007, Petitioner refused an ophthalmological surgical appointment. *Id.*

16  at 2230.

17  From 2005 to 2007, Petitioner refused medical examinations or treatment for his

18  conditions, including for his diabetes, despite being advised of the consequences. The dates on

19  which Petitioner refused treatment or an appointment included: January 15, 2005 (*id.* at 4071),

20  March 31, 2005 (*id.* at 4073), April 10, 2005 (*id.* at 4072), June 28, 2005 (*id.* at 4067), August 8,

21  2005 (*id.* at 2281), November 14, 2005 (*id.* at 2277), January 29, 2006 (*id.* at 2272), January 31,

22

23  ———————————

24  [13] According to the Mayo Clinic, IDDM stands for insulin-dependent diabetes mellitus,
    which is the former name for Type 1 diabetes, a chronic condition in which the pancreas produces

25  little or no insulin. *See* Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/type-1-diabetes/symptoms-causes/syc-20353011 (last visited Nov. 29, 2017).

26  [14] According to the Mayo Clinic, GERD stands for gastroesophageal reflux disease, which
    "occurs when stomach acid frequently flows back into the tube connecting your mouth and

27  stomach (esophagus). This backwash (acid reflux) can irritate the lining of your esophagus." *See*
    Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/gerd/symptoms-causes/syc-

28  20361940 (last visited Nov. 29, 2017).

2006 (*id*. at 2271), February 13, 2006 (*id*. at 4053), March 24, 2006 (*id*. at 2266, 4050), April 3, 2006 (*id*. at 2264, 4048), April 26, 2006 (*id*. at 4045), May 1, 2006 (*id*. at 2260, 4044), May 8, 2006 (*id*. at 2259, 4043), June 13, 2007 (*id*. at 4098), June 15, 2007 (*id*. at 4097), June 21, 2006 (*id*. at 2250, 4043), July 16, 2006 (*id*. at 2246), February 8, 2007 (*id*. at 2230), February 13, 2007 (*id*. at 2230), December 13, 2007 (*id*. at 2230), and December 23, 2007 (*id*. at 4094).[15]

### c.    2008

On May 20, 2008, Petitioner had a chronic care follow-up visit. *Id*. at 3621. The assessing doctor noted as "diagnoses" diabetes, hypertension, and increased lipids. *Id*. Notes about a discussion of "complaints/problems" did not reference anything relating to vision. *Id*.

On August 28, 2008, Petitioner completed a health care services request form, apparently in his own handwriting, stating: "Yes I got brown spot in my eyes & a blood vessel & I can barely see out of my left eye & I[']m a diabetic[.] Thank you[.]" *Id*. at 3592. According to the "Encounter Form" dated on the same date, Petitioner complained of "blood in eye" and "see[ing] blood as he look[ed] around. " *Id*. at 3593. Petitioner's visual acuity was noted as 20/80 in both eyes. *Id*. He was sent to the Triage and Treatment Area. *Id*. Petitioner's doctor requested an urgent consultation with optometry. *Id*. at 2189-2190, 608. Notes from a consultation that day diagnosed Petitioner with a vitreous hemorrhage,[16] and recommended "better diabetic control" and

---

[15] Medical staff completed a refusal form when Petitioner refused an appointment or treatment. The forms indicate that when Petitioner refused insulin or other treatment for his diabetes, he was "fully informed of the risks and possible consequences involved in refusal of the examination and/or treatment in the manner and time prescribed[.]" *See, e.g.,* Resp't Ex. A at 2272 (January 29, 2006 refusal form noting that after Petitioner refused insulin he was "educated on potential ↑ + ↓ in bloodsugars resulting in coma + death"), 2266 (March 24, 2006 refusal form noting that Petitioner was "informed of side effects" of refusing insulin). In 2011, several refusal forms indicate that after refusing insulin Petitioner was read a warning stating that high blood sugar left untreated can cause "eye and kidney disease[.]" *Id*. at 1975-1978, 1960-1961.

[16] According to the Mayo Clinic:

Diabetic retinopathy involves the abnormal growth of blood vessels in the retina. Complications can lead to serious vision problems, including vitreous hemorrhage, which is when the new blood vessels may bleed into the clear, jelly-like substance that fills the center of your eye. If the amount of bleeding is small, you might see only a few dark spots (floaters). In more-severe cases, blood can fill the vitreous cavity and completely block your vision.

*See* Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/diabetic-

an urgent ophthalmology evaluation. *Id.* at 2189. Another form generated that day requested an urgent eye operation for Petitioner, noting he "needs laser to both eyes." *Id.* at 2184.

About a week later, on September 9, 2008, Petitioner refused a consultation with ophthalmology, stating the blood vessel "is healed." *Id.* at 2184, 2186. On September 16 and 18, Petitioner's doctor referred him for laser treatment, noting he had proliferative diabetic retinopathy and vitreous hemorrhage. *Id.* at 2205, 606. About a week later, Petitioner underwent offsite laser surgery on his left eye. *Id.* at 1871, 2204, 2182. Right eye laser was recommended or scheduled for one to two weeks later. *Id.* at 4092. On October 30, Petitioner refused to have left eye surgery. *Id.* at 2173-2174, 3956. An outpatient interdisciplinary progress report in late December noted Petitioner's continuing problems with neuropathy, including numbness and tingling in his feet, but that Petitioner was pleasant and in no distress. *Id.* at 3552. No visual problems were noted. *Id.*

Throughout 2008, Petitioner refused examinations or treatment related to his chronic conditions, including insulin, despite being advised of the consequences, including on January 30 (*id.* at 2229), March 6 (*id.* at 2221), May 28 (*id.* at 2212), June 9 (*id.* at 2210), June 11 (*id.* at 3993, 2209), July 5 (*id.* at 2202), July 17 (*id.* at 3986, 2199), July 27 (*id.* at 3985, 2198), August 3 (*id.* at 2389), August 17 (*id.* at 3982, 2195), September 2 (*id.* at 3975, 2188), October 5 (*id.* at 2180, 3964), October 20 (*id.* at 2178, 2177, 2175, 3961-3962), October 25 (*id.* at 3960, 2176), October 30 (*id.* at 3955, 2172), November 5 (*id.* at 2170), November 7 (*id.* at 2169), November 10 (*id.* at 2167), November 12 (*id.* at 2166), and November 14 (*id.* at 2165).

#### d. 2009-2010

On March 23, 2009, Petitioner completed a health services request form, apparently in his own writing, stating: "Yes I woke up this morning & my right eye was swollen, I don't know if it's an allergic reaction or an eye cold, I'm a diabetic, can you see me A.S.A.P. Thank you." *Id.* at 1098. Two days later, Petitioner reported to a nurse that he had been experiencing "dull" pain in his "inner" right eye for two weeks. *Id.* at 1099. The nurse noted that Petitioner had "redness"

retinopathy/symptoms-causes/syc-20371611 (last visited Nov. 30, 2011).

15

United States District Court
Northern District of California

in both eyes, had "laser surg[ery]" on his left eye, and was awaiting the same surgery on his right eye. *Id.*

On June 25, 2009, Petitioner was admitted to Mercy Hospital in Bakersfield for left foot cellulitis. *Id.* at 3323.

In July 2009, Petitioner apparently had meningitis. *See id.* at 2144.

On October 23, 2009, Petitioner's doctor diagnosed him with possible "intraocular bleeding" and requested an urgent appointment with ophthalmology. *Id.* at 2093. The doctor noted that Petitioner had "poorly controlled" diabetes, blurry vision, and "possibly needs laser for proliferative intraocular disease." *Id.* On October 28, 2009, Petitioner was referred to a retinologist. *Id.* at 543.

On November 3, 2009, a "Clinical Encounter Effective Communication Form" indicated Petitioner had "[n]o disabilities or issues requiring equally effective communication" and that he "stated that he did not need any assistance for Effective Communication." *Id.* at 2514. On November 20, 2009, Petitioner refused to be transported to an outside consultation with ophthalmology. *Id.* at 1537.

On December 5, 2009, Petitioner was again referred to ophthalmology. *Id.* at 535.

On December 8, 2009, Petitioner completed a health care services request form marked "urgent" and stating: "Yes I'm a diabetic, & I got blood vessels busted in both eyes, can't see clear[l]y . . . vision very blur[r]y, can't even work [or] write a letter, my celly had to write this for me[,] going on two weeks—Thanks." *Id.* at 1059.

On January 4 and 15, 2010, Petitioner was referred for an "urgent" "retina consult [and] possible surgery." *Id.* at 531, 534. On January 12, 2010 Petitioner completed a health care services request form stating: "I am a diabetic & I'm scheduled for 'lasik' surgery[.] I have no vision in my right eye whatsoever & my left is almost the same exact way, I can barely see where I'm walking[.] I need to be medically unassigned . . . till they fix problem, I can't see, so how can I work[?]" *Id.* at 1057. Three days later, on January 15, 2010, Petitioner's doctor noted that Petitioner was "losing vision" and "need[ed] surgery soon." *Id.* at 1056. On the same day, Petitioner was examined by an ophthalmologist, who noted Petitioner had proliferative diabetic

16

retinopathy in his right eye and surgical intervention was "required." *Id.* at 2084.

On January 28, 2010, Petitioner's doctor referred him for outpatient surgery on his right eye. *Id.* at 2078. The doctor's note indicated diagnoses of proliferative diabetic retinopathy and vitreous hemorrhage. *Id.* at 529. The notes said: "High risk of blindness," and indicated Petitioner "did not show" for an ophthalmology appointment, which was also scheduled on that same day. *Id.* (emphasis in original). Petitioner apparently had an "urgent retina consult" appointment pending. *Id.; see also id.* at 526 (noting retina consult pending and diagnosis of "proliferative diabetic retinopathy with resolving vitreous hem[orrhage]" on February 3, 2010).

On February 11, 2010, a vitrectomy[17] and laser surgery was requested and then later scheduled for Petitioner's right eye, apparently due to a detached retina. *Id.* at 1053, 2066, 2062, 2447, 2445, 2059, 2061. The surgery was conducted on April 26. *Id.* at 1041, 1045, 1046, 2440.

On April 28, 2010, Petitioner submitted an "Olsen Review Request" of his mental health records for 2004-2006 to show to the committee reviewing his Enhanced Out Patient ("EOP") placement. *Id.* at 2732. Petitioner's social worker reported that Petitioner's eyes were red from recent eye surgery and that he had slight discomfort but appeared stable. *Id.*

On May 5, 2010, Petitioner refused to see the eye doctor, stating that he already had eye surgery and had been "checked out." *Id.* at 2054.

On May 11 and 12, 2010, Petitioner's doctor requested that Petitioner receive retinal laser surgery for loss of vision, pursuant to ophthalmology. *Id.* at 2051-2052. It appears that the laser surgery was conducted on May 13, 2010. *Id.* at 2439.

On or around June 1, 2010, Petitioner was seen by Bakersfield Pathology Medical Group for erosive gastritis and a stomach biopsy. *Id.* at 1834.

On June 7, 2010, it was determined that Petitioner met the criteria for the "Disability Placement Program - DPV" or the Permanent Disability Impacting Placement—Blind/Vision

---

[17] According to the Mayo Clinic, vitrectomy is the draining and replacing the fluid in the eye wherein "the surgeon removes the vitreous (or jelly-like substance) along with any tissue that is tugging on the retina. Air, gas or silicone oil is then injected into the vitreous space to help flatten the retina." *See* Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/retinal-detachment/diagnosis-treatment/drc-20351348 (last visited Nov. 30, 2017).

Impairment level. *Id.* at 1533; *see also id.* at 1030. A notice alerted staff that Petitioner "is blind and needs accommodation." *Id.* at 1535. The notice said Petitioner has "complex needs affecting placement," required a vision-impaired vest, and must be housed in a lower bunk with no stairs. *Id.* However, it further states "[n]o 'EFFECTIVE COMMUNICATION' issues observed or documented in the Unit Health Record." *Id.* The same day, a DPV verification form confirmed Petitioner's disability as "blind/vision impaired." *Id.* at 1520. Petitioner was given a walking cane for one year, permitted a wheelchair for thirty days, and prohibited job assignments requiring bending, heavy lifting, twisting, or strenuous activities for thirty days. *Id.* at 1519.

On June 9, 2010, a Primary Care Provider Progress Note indicated that Petitioner had undergone right eye surgery for a detached retina a week prior, and surgery at Bakersfield Hospital for meningitis. *Id.* at 1038. Petitioner reported that his vision was returning but not fully recovered. *Id.* In mid and late June 2010, Petitioner's physician requested ophthalmology follow up consultations for vision loss, vitreous hemorrhage, and retinopathy. *Id.* at 2038, 506. Also in late June, a chronic-care follow-up visit noted that Petitioner's "chronic" diseases included visual impairment, with notations indicating diabetes and meningitis. *Id.* at 1034. Petitioner was instructed to continue with eye-drops he had been prescribed. *Id.* Petitioner was told that his vision "will get better" and he "agree[d] to improving vision." *Id.*

In early July 2010, Petitioner reported that he could only see shadows. *Id.* at 1033. Petitioner was referred to ophthalmology on July 9, and by late July had several eye procedures scheduled. *Id.* On July 22, 2010, a Primary Care Provider Progress Note indicated that Petitioner said he "felt well." *Id.* at 1030. It further states as follows:

> He says he had bilateral eye vision loss after he had meningitis 6/09 and was hospitalized in San Joaquin Hospital in Bakersfield. He experienced retinal detachment OD [right eye] that has been repaired, but still has significant vision loss OU [left eye] that requires him DPV status and help with an attendant. He says he can distinguish objects at <5 feet away and that his vision is best OD>OS.

*Id.*; *see also id.* at 1020, 1013.

On August 18, 2010, Petitioner initiated a request stating, "I need my Hadley School for the Blind eye [report] completed by the eye doctor." *Id.* at 1016.

18

In late September, Petitioner completed a health services request, with the help of a nurse, stating that he needed to see a doctor for "diabetes/vision ASAP." *Id.* at 1016.

Petitioner's legal blindness due to diabetic retinopathy and use of a tapping cane and walking attendant are documented in his medical records throughout the remainder of 2010. *See id.* at 1518, 2020, 1013, 2720, 2011, 2013, 2010, 1514, 2009, 2007, 1013, 1013, 999, 1008.

On December 21, 2010, Petitioner initiated a health-care services request asking that his primary-care provider "fill out [his] Hadley School eye report so [he] may attend classes." *Id.* at 1004. That same day, Petitioner's doctor wrote a note stating: "please go to inmate's cell and get his Hadley School report and send to in house clinic." *Id.* at 460. A week later, Petitioner's physician completed a form for the Hadley School for the Blind noting that Petitioner met the standard definition of blindness and that the condition was "progressive" and due to proliferative diabetic retinopathy. *Id.* at 2007.

Throughout 2009 and 2010, Petitioner refused examinations or treatment, including insulin or blood sugar monitoring, despite being advised of the consequences, including on January 1, 2009 (*id.* at 2132), January 2, 2009 (*id.* at 2131), February 15, 2009 (*id.* at 2124), February 25, 2009 (*id.* at 2122), February 26, 2009 (*id.* at 2121), March 30, 3009 (*id.* at 2088), March 12, 2009 (*id.* at 2116), March 30, 3009 (*id.* at 2112), April 5, 2009 (*id.* at 2111), April 6, 2009 (*id.* at 2108), April 17, 2009 (*id.* at 2107), April 20, 2009 (*id.* at 2105), April 22, 2009 (*id.* at 2104), July 10, 2009 (*id.* at 2099), November 30, 2009 (*id.* at 2089), February 6, 2010 (*id.* at 2080), January 16, 2010 (*id.* at 2083), February 11, 2010 (*id.* at 2079), February 13, 2010 (*id.* at 2076), February 27, 2010 (*id.* at 2075), March 10, 2010 (*id.* at 2074), March 12, 2010 (*id.* at 2072-2073), March 13, 2010 (*id.* at 2071), March 17, 2010 (*id.* at 2070), March 19, 2010 (*id.* at 2069), April 2, 2010 (*id.* at 2068), April 18, 2010 (*id.* at 2065), April 27, 2010 (*id.* at 2057), May 2, 2010 (*id.* at 2056), June 12, 2010 (*id.* at 2048), June 15, 2010 (*id.* at 2047), and June 18, 2010 (*id.* at 2045), July 12, 2010 (*id.* at 1994), August 13, 2010 (*id.* at 2030-2031), and September 7, 2010 (*id.* at 2027).

### e. 2011

In January 2011, a doctor noted that Petitioner's combination of eye symptoms was most consistent with "VKH," *id.* at 2006, or Vogt-Koyanagi Harada Syndrome, a rare autoimmune

United States District Court
Northern District of California

condition later described as possibly hereditary and associated with uveitis, retinal detachment, and blindness. *Id.* at 1938-1939, 1234, 834, 855. In April and May, 2011, Petitioner requested reassignment to an institution that provided Braille services, and complained that his current institution could not properly address his almost total blindness. *Id.* at 1510, 1512, 1530.

Petitioner complained of decreasing vision in the summer and fall of 2011, including the ability to see only shadows and being unable to follow light. *Id.* at 1985, 1988, 965-966, 2692, 941. In late July, Petitioner reported that he still had significant vision loss, could distinguish objects from less than five feet away, and had better vision in his right eye than left. *Id.* at 965.

Petitioner underwent surgeries and injections during the fall of 2011, including cataract surgery on his right eye, to attempt to improve his little remaining vision. *Id.* at 1981, 1984, 1969, 1979, 1972, 1965, 1963, 1871, 935-937, 412, 1940, 1951, 1958, 412, 944, 951, 415, 945. After cataract surgery in mid-September 2011, he reported that he had blurry vision in his right eye. *Id.* at 943.

On October 24, 2011, Petitioner refused transport to an offsite medical appointment because he had an attorney visit. *Id.* at 1487-1488.

In November 2011, Petitioner was referred for another cataract surgery. *Id.* at 395, 939, 936, 392, 390.

On December 6, 2011, Petitioner began refusing the cataract surgery, apparently because he believed it would facilitate a pending transfer to an EOP placement at a new prison. *Id.* at 932, 1954, 2666, 932. In late December 2011, Petitioner complained that ADA workers were not trained to work with blind people and that there were no Braille computers. *Id.* at 2666. He believed he had not been adequately treated for his VKH syndrome, which he also believed caused his albinism, although his social worker noted he had declined treatment for progressive late life albinism due to its side effects. *Id.* at 2666.

Petitioner's legal blindness and use of a walking cane and walking attendant were well documented throughout 2011. *See id.* at 2003, 2005, 2314, 1513, 1529, 1989-1990, 1506, 966, 941, 1486, 965, 941.

Throughout 2011, Petitioner refused examinations or treatment, including insulin, despite

20

being advised of the consequences, including on January 18 (*id.* at 2000), February 4 (*id.* at 1998), February 8 (*id.* at 1996), February 27 (*id.* at 1531), March 7 (*id.* at 1992), March 17 (*id.* at 1530), July 21 (*id.* at 1507), July 22 (*id.* at 1505), July 26 (*id.* at 1503), August 2 (*id.* at 1501-1502), August 4 (*id.* at 1500), August 5 (*id.* at 1498-1499), August 9 (*id.* at 1497), August 11 (*id.* at 1496), August 14 (*id.* at 1978), August 19 (*id.* at 1495), August 20 (*id.* at 1977), August 25 (*id.* at 1494), September 2 (*id.* at 1493), September 7 (*id.* at 1492), October 3 (*id.* at 1964), October 7 (*id.* at 1961), October 16 (*id.* at 1489), October 17 (*id.* at 1490), October 22 (*id.* at 1960), December 3 (*id.* at 932), and December 5 (*id.* at 1999).[18]

### f.  2012

Petitioner's legal blindness, related disability placement, and use of a cane and vision vest were well documented throughout 2012.  *See, e.g., id.* at 8, 912, 907, 364, 1237-1238, 1906, 1480, 2618, 886, 879-879, 1235-1236, 1234, 884, 889, 877, 885, 883.  Petitioner's blindness was generally attributed to gradual or progressive diabetic retinopathy, VKH syndrome, and being "poorly compliant" with his diabetes.  *Id.* at 906, 1942, 867, 1234, 863, 1895, 1896, 1893.[19]

On March 30, 2012, Petitioner reported that he had been waiting seven months to transfer to EOP and that he was "going blind."  He also reported that he attended school and listened to books on tape.  *Id.* at 2651.  Petitioner was transferred to the EOP level of care some time in 2012, likely in late April.  *See id.* at 912, 907, 364-365, 3060.  That month, Petitioner completed a health services request form stating he was legally blind and "now my vision is almost gone and I need to know if my eye appointment with the outside doctor is coming up."  *Id.* at 1945; *see also id.* at 913.  It was noted in April and June that despite his disability Petitioner was able to achieve

---

[18] In the fall of 2011, refusal records indicate that after refusing insulin Petitioner was read a warning stating, in part, that high blood sugar can cause "eye and kidney disease[.]"  *Id.* at 1975-1978, 1960-1961.

[19] Petitioner had attributed his blindness to catching spinal meningitis in 2009 or 2010 and waking up from a coma around that time or sometime between 2010 and 2012 in a Bakersfield hospital.  *See* Resp't Ex. A at 2641, 2640, 2639, 2621, 2601, 2574, 3147, 1861, 999, 999, 965.  However, there is nothing in the record of a 2009 or 2010 hospital stay resulting in blindness.  There exists one record that appears to document that Petitioner had meningitis in July 2009.  *Id.* at 2144 (2011 Banner Lassen Medical Center Triage Record noting review of Petitioner's medical history).

effective communication. *Id.* at 1238, 901.

On May 4, 2012, Petitioner's doctor requested a referral to ophthalmology to determine how much Petitioner could see. *Id.* at 362. A couple days later, an interdisciplinary progress note indicated Petitioner was completely blind in his left eye and that his right eye had a cataract and inflammation. *Id.* at 2641. On May 10, 2012, Petitioner had an offsite ophthalmologist consultation. The ophthalmologist assessed Petitioner's visual acuity as "hand motion" in his right eye and "light perception" in his left eye. *Id.* at 1938-1939. In late May 2012, it was noted that Petitioner required a complex cataract removal in his left eye. *Id.* at 2326, 1933.

Petitioner underwent cataract removal surgery in mid June 2012. *Id.* at 2635. Prior to the surgery, Petitioner reported that he continued to adjust to his blindness and believed there was a 50/50 chance that the operation would improve his vision. *Id.* at 2635. However, the surgery led Petitioner's ophthalmologist to conclude that Petitioner's retinal detachment was probably "long standing" and that further surgery would probably not improve his vision. *Id.* at 1924, 1917, 1919. Petitioner's chronic VKH syndrome was noted as "irreparable" in his left eye. *Id.* at 1919.

In mid-July 2012, it was noted that Petitioner "glimpses shadows" in his right eye. *Id.* at 2629. In July 2012, staff noted that it appeared Petitioner had lied to them about receiving a visit from his daughter (which he claimed caused him distress), and from his attorney (no visitors were noted). *Id.* at 2621-2622. In August, Petitioner's physician noted his behavior was "litigious" and that Petitioner claimed he had lawsuits pending against EOP and a former clinician. *Id.* at 2618; *see also id.* at 901, 906 (staff noting Petitioner referenced multiple lawsuits against CDCR in May and June 2012).

On October 1, 2012, it was noted that Petitioner was being transferred to Salinas Valley State Prison ("SVSP") because, according to Petitioner, SVSP "have facilities to accommodate the blind." *Id.* at 2614. An admission assessment noted that Petitioner was ambulating with a cane and was oriented to room and movement. *Id.* at 879.

Also on October 1, 2012 a "treatment plan" indicated that Petitioner should remain free of falls and use an assisting device to prevent falls. *Id.* at 883. A "level of care" assessment completed that day noted that Petitioner independently provided self-care, managed meals without

assistance, ambulates, transfers, and uses the toilet without assistance, and was "able to hear and understand complex or detailed instructions." *Id.* at 880. He was "alert" and "oriented" as to people, place, and time. *Id.* at 871, 879.

For the remainder of 2012, Petitioner reported to mental health staff that he was adjusting to losing his sight, which he often said occurred "two years ago." *Id.* at 3214, 2617, 2591, 2589. A September 27, 2017 interdisciplinary progress note referred to a suicide attempt in 2011 and noted that "UHR review reveals [Petitioner] is a poor historian and likely has been exaggerating his symptoms." *Id.* at 2617. The note further stated as follows:

> [Petitioner's] primary concern stems from his blindness, which he has been gradually adjusting to over the past year and a half . . . [and that Petitioner] endorses a belief that he is being intentionally maltreated by mental health system "due to blindness" and reports he has several lawsuits currently pending . . . . [I]n consultation with building staff, there is suspicion from more than one independent staff that this inmate is not legally blind, and that he can in fact read.

*Id.*

In late November 2012, Petitioner's doctor noted that he had very decreased vision in his right eye and that due to VKH his vision was worsening. *Id.* at 863.

In early December 2012, an offsite ophthalmologist noted Petitioner's vision loss was a "gradual" condition, that Petitioner had "VKH with mild activity in right eye," and that the doctor "[r]eviewed and discussed living with vision loss material with patient." *Id.* at 1892-1893. It was noted that Petitioner was able to administer his own eye-drops with no difficulty determining which were which. *Id.* at 861.

Throughout 2012, Petitioner refused examinations or treatment, such as insulin, despite often being advised of the consequences, including on January 9 (*id.* at 930), January 23 (*id.* at 1949), January 25 (*id.* at 1484), March 23 (*id.* at 1947), April 2 (*id.* at 1946), April 15 (*id.* at 1481), April 24 (*id.* at 1944), August 22 (*id.* at 1913, 889), September 14 (*id.* at 1910), September 15 (*id.* at 1909), September 12 (*id.* at 1911, 1474), September 14 (*id.* at 1473), September 15 (*id.* at 1472), September 18 (*id.* at 1908), September 18 (*id.* at 1471), September 20 (*id.* at 1470, 1907), September 28 (*id.* at 1468), October 2 (*id.* at 1903), October 9 (*id.* at 1467), October 17 (*id.*

23

at 1465-1466), October 23 (*id*. at 1464), October 30 (*id*. at 1463), November 5 (*id*. at 1899),
November 27 (*id*. at 1462), and December 12 (*id*. at 1891).

### g.    2013

Petitioner's disability due to blindness and use of a cane and attendant continued to be well documented in 2013.  *Id.* at 834, 830, 827, 1456, 1453, 819, 821, 201, 827-828, 821, 819. Throughout 2013, Petitioner reported to mental health professionals that he was adjusting to his loss of sight.  *Id.* at 2580, 2578, 2564, 2556, 2558.  In addition, Petitioner received injections and underwent offsite procedures to preserve the limited vision in his right eye.  *Id.* at 855, 850, 2573, 844, 840, 1871, 1887, 1885-1886, 1878, 1876-1877, 1878-1879, 827, 1867, 1860, 192, 1759.

In January 2013, Petitioner was able to discriminate movement in his right eye but had no vision in his left eye.  *Id.* at 850, 840.  Petitioner had a notable cataract forming in his right eye and his vision was continuing to decrease in that eye.  *Id.* at 855.  In late January 2013, Petitioner underwent a corneal suture removal and subsequently reported that he noticed mild improvement, including that he could discriminate movement in his right eye.  *Id.* at 850.

In February and March 2013, Petitioner could see some light and slight movement in his right eye.  *Id.* at 2573.

On February 20, 2013, Petitioner expressed frustration that there were no resources at SVSP for blindness and that he was not receiving adequate care for his disability.  *Id.* at 2567.

On March 4, 2013, Petitioner reported being frustrated that he was not in a program to address his blindness, that he wanted to learn Braille, and that he wanted to have reading material for the blind.  *Id.* at 2564.

In April 2013, Petitioner continued to express his frustration, prompting his social worker to note that his "expectations of the EOP program [are] unrealistic, needs to develop skills to cope with prison life and lack of resources."  *Id.* at 2556, 2558.

Also in April 2013, an offsite ophthalmologist noted that that the "last resort left to try to improve the vision in this patient's only eye is to do a vitrectomy in the right eye."  *Id.* at 1871, 1872.

On May 5, 2013, a DPV verification form noted that Petitioner needed assistance with

walking but not with feeding, eating, bathing, grooming, or using the toilet. A physician noted that Petitioner "requires assistance with reading/writing but effective communication easily achieved using normal speech/conversation. Has no hearing impairment (per [Petitioner's] self-identification). Blindness impairs mobility but otherwise no mobility impairment." *Id.* at 1453; *see also id.* at 1454.

On May 3, 2013, Petitioner refused an appointment with optometry, and was informed that by refusing to see the optometrist "to assist with your vision needs, diabetic eye care, glaucoma eye care, eye infection or trauma you are increasing the risk of further damage to your eyes, permanent vision changes and/or blindness." *Id.* at 1870. In mid-May 2013, Petitioner reported involvement in Braille training and a class for blind inmates. *Id.* at 3071.

It appears Petitioner underwent surgery on his right eye in late August 2013. *See id.* at 1852, 1854, 821. On August 6, 2013, it was noted that Petitioner was ready for "enhanced self health management." *Id.* at 823.

A doctor's note on October 31, 2013 said that Petitioner "has shifted his chronic medical conditions onto Valley Fever that he states has caused him to go blind and his vitiligo. In fact his condition was chronic starting in childhood." *Id.* at 3273.

On November 6, 2013 a doctor noted Petitioner could not see the movement of the doctor's fingers. *Id.* at 813.

In late December 2013, Petitioner asked his physician: "why am I taking glaucoma medications? I am blind. Is there a benefit to taking them?" *Id.* at 808.

Throughout 2013, Petitioner refused examinations or treatment related to his chronic conditions, despite often being advised of the consequences, including on March 20 (*id.* at 1875), May 2 (*id.* at 1869), May 3 (*id.* at 1870), May 15 (*id.* at 1868), June 6 (*id.* at 1866), June 11 (*id.* at 1865), September 9 (*id.* at 1765), November 27 (*id.* at 1763), December 3 (*id.* at 1763), and December 11 (*id.* at 1448). On November 12 and November 19, 2013, it was noted that Petitioner had missed 50% or more of his "DOT and/or nurse administered medications" in the last week, either due to refusal, "no show," or other unexplained reasons. *Id.* at 1449-1450. The same was noted on December 19, 2013, with an additional note that Petitioner had refused treatment for 20

days consecutively. *Id.* at 1447; *see also id.* at 1448.

### h. 2014-2016

Petitioner's blindness continued to be well documented from 2014 to 2016. *Id.* at 802-803, 1231-1232, 1229-1230, 1745, 1668, 1721, 1601, 803, 795, 801, 799, 780, 105, 777, 67, 57-58, 769, 764, 10, 742. On December 12, 2014, Petitioner declined to see his doctor because he had an attorney visit. *Id.* at 1691.

In late January 2014, it was noted that Petitioner displayed "readiness for enhanced self-management as evident by requesting renewal of eye drops." *Id.* at 806. On February 6, 2014, Petitioner had improved to a point that he asked to leave the EOP program. He was apparently transferred to the CCCMS level of care (a lower level of care) that day. *Id.* at 3261. On March 10, 2014, Petitioner referenced meeting with a lawyer. *Id.* at 798. On December 12, 2014, Petitioner declined to see his doctor because he had an attorney visit. *Id.* at 1691. On May 5, 2016, Petitioner reported that he completed a Braille Literacy 3 class. *Id.* at 3243.

Throughout 2014-2016, Petitioner refused examinations or treatment, such as insulin, despite often being advised of the consequences. On January 1, 14 and 21, 2014, it was noted that Petitioner had missed 50% or more of his "DOT and/or nurse administered medications" in the last week, either due to refusal, "no show," or other unexplained reasons. *Id.* at 1444-1446. Petitioner refused other treatment or appointments on January 6, 2014 (*id.* at 182), February 25, 2014 (*id.* at 1753), March 4, 2014 (*id.* at 1750), March 7, 2014 (*id.* at 1749), March 18, 2014 (*id.* at 1744), March 19, 2014 (*id.* at 1743), March 24, 2014 (*id.* at 1742), March 25, 2014 (*id.* at 1741), March 26, 2014 (*id.* at 1740), April 1, 2014 (*id.* at 1739), April 14, 2014 (*id.* at 1738), April 22, 2014 (*id.* at 1737), May 1, 2014 (*id.* at 1735), June 20, 2014 (*id.* at 1733), June 24, 2014 (*id.* at 1732), June 28, 2014 (*id.* at 1731), July 15, 2014 (*id.* at 1729), July 30, 2014 (*id.* at 1736), August 15, 2014 (*id.* at 1725), August 22, 2014 (*id.* at 1723-1724), August 23, 2014 (*id.* at 1722), September 16, 2014 (*id.* at 1719), September 24, 2014 (*id.* at 1718), September 30, 2014 (*id.* at 1717), October 1, 2014 (*id.* at 1716), October 2, 2014 (*id.* at 1715), October 5, 2014 (*id.* at 1714), October 7, 2014 (*id.* at 1713), October 8, 20154 (*id.* at 1712), October 9, 2014 (*id.* at 1711), October 12, 2014 (*id.* at 1710), October 14, 2014 (*id.* at 1709), October 21, 2014 (*id.* at 1706),

October 23, 2014 (*id.* at 1705), October 24, 2014 (*id.* at 1704), November 2, 2014 (*id.* at 1701),

November 9, 2014 (*id.* at 1699-1700), November 11, 2014 (*id.* at 1698), November 14, 2014 (*id.*

at 1697), November 18, 2014 (*id.* at 1696), November 24, 2014 (*id.* at 1695), November 26, 2014

(*id.* at 1694), November 29, 2014 (*id.* at 1693), November 30, 2014 (*id.* at 1692), December 12,

2014 (*id.* at 1691), December 31, 2014 (*id.* at 1689), January 1, 2015 (*id.* at 1688), January 2, 2015

(*id.* at 1687), January 3, 2015 (*id.* at 1685-1686), January 4, 2015 (*id.* at 1684), January 7, 2015

(*id.* at 1683), January 10, 2015 (*id.* at 1682), January 11, 2015 (*id.* at 1681), January 14, 2015 (*id.*

at 1679), January 16, 2015 (*id.* at 1678), January 18, 2015 (*id.* at 1677), January 20, 2015 (*id.* at

1676), January 22, 2015 (*id.* at 1675), February 8, 2015 (*id.* at 1671-1672), February 19, 2015 (*id.*

at 1674), February 20, 2015 (*id.* at 1673), March 1, 2015 (*id.* at 1670), March 10, 2015 (*id.* at

1669), March 17, 2015 (*id.* at 1667), March 19, 2015 (*id.* at 1666), March 20, 2015 (*id.* at 1665),

March 21, 2015 (*id.* at 1664), March 22, 2015 (*id.* at 1662-1663), March 23, 2015 (*id.* at 1660

1661), March 27, 2015 (*id.* at 1659), March 30, 2015 (*id.* at 1658), April 3, 2015 (*id.* at 1657),

April 11, 2015 (*id.* at 1656), May 4, 2015 (*id.* at 1655), May 11, 2015 (*id.* at 1654), May 20, 2015

(*id.* at 1652), May 28, 2015 (*id.* at 1651), June 1, 2015 (*id.* at 1649-1650), June 5, 2015 (*id.* at

1648), June 8, 2015 (*id.* at 1647), June 11, 2015 (*id.* at 1646), June 25, 2015 (*id.* at 1645), June 27,

2015 (*id.* at 1643), June 29, 2015 (*id.* at 1644), July 3, 2015 (*id.* at 1642), July 23, 2015 (*id.* at

1641), July 29, 2015 (*id.* at 1640), August 3, 2015 (*id.* at 1639), August 8, 2015 (*id.* at 22 1638),

August 14, 2015 (*id.* at 1637), August 25, 2015 (*id.* at 1636), September 1, 2015 (*id.* at 1635),

September 8, 2015 (*id.* at 1634), September 16, 2015 (*id.* at 1632), September 21, 2015 (*id.* at

1631), September 24, 2015 (*id.* at 1630), September 27, 2015 (*id.* at 1629), September 29, 2015

(*id.* at 1628), September 30, 2015 (*id.* at 1627), October 31, 2015 (*id.* at 1626), November 23,

2015 (*id.* at 1625), December 17, 2015 (*id.* at 1624), January 5, 2016 (*id.* at 1622-1623, 768),

January 21, 2016 (*id.* at 767), January 22, 2016 (*id.* at 1621), January 27, 2016 (*id.* at 1620),

January 29, 2016 (*id.* at 1619), January 30, 2016 (*id.* at 766), February 19, 2016 (*id.* at 1618, 763),

March 14, 2016 (*id.* at 1617), May 20, 2016 (*id.* at 1615), May 25, 2016 (*id.* at 1614), June 5,

2010 (*id.* at 1613), June 13, 2016 (*id.* at 1612), July 3, 2016 (*id.* at 1611), July 5, 2016 (*id.* at 758),

July 8, 2016 (*id.* at 1610), July 18, 2016 (*id.* at 1608), July 22, 2016 (*id.* at 756), July 28, 2016 (*id.*

United States District Court
Northern District of California

at 1609), August 16, 2016 (*id.* at 1607, 755), August 25, 2016 (*id.* at 1606), August 27, 2016 (*id.* at 1604-1605), August 28, 2016 (*id.* at 1603), September 7, 2016 (*id.* at 1602), September 15, 2016 (*id.* at 1600), October 10, 2016 (*id.* at 1598, 750), November 15, 2016 (*id.* at 1597), December 16, 2016 (*id.* at 1596).

Petitioner's substantial non-compliance with his medications was discussed with him on February 1, 2016 (*id.* at 765), August 23, 2016 (*id.* at 753), and October 10, 2016 (*id.* at 749). On August 23, 2016, he was advised of the long-term consequences of diabetes, including the potential for blindness, and the importance of complying with his treatment. *Id.* at 753.

### 2. Summary of Petitioner's Medical Health Services Request Forms

Petitioner's medical records reveal that he frequently initiated medical health services requests on his own behalf, sometimes drafting them himself articulately and legibly. Below are the health services requests that we located, by year:

● **2005**: February 23 (*id.* at 1192), April 6 (*id.* at 1190), May 6 (*id.* at 1189), May 16 (*id.* at 1186), July 7 (*id.* at 1182), July 24 (*id.* at 1181), August 18 (*id.* at 1176), August 24 (*id.* at 1174), October 17 (*id.* at 1169), October 4 (*id.* at 1170), October 24 (*id.* at 1168), December 16 (*id.* at 1165), December 16 (*id.* at 3718); December 20 (*id*. at 1164);

● **2006**: January 23 (*id.* at 1162), January 30 (*id.* at 1161), January 30 (*id.* at 3714), February 6 (*id.* at 3712), February 3 (*id.* at 1159), February 14 (*id.* at 3711), February 14 (*id.* at 1158), February 30 (*id.* at 1160), February 30 (*id.* at 3713), April 19 (*id.* at 3701), April 19 (*id.* at 3702), April 19 (*id.* at 1148), April 19 (*id.* at 1149), May 20 (*id.* at 3656), May 22 (*id.* at 3700), May 22 (*id.* at 1147); May 24 (*id.* at 3698), May 24 (*id.* at 1145), June 6 (*id.* at 3616), July 26 (*id.* at 1132); August 10 (*id.* at 1130); August 28 (*id.* at 1127); October 5 (*id.* at 1121); October 6 (*id.* at 1120); October 6 (*id.* at 36550);

● **2007**: April 22 (*id.* at 3684); October 1 (*id.* at 3649), October 15 (*id.* at 3646), October 31 (*id.* at 3641), December 3 (*id.* at 3640);

● **2008**: on January 15 (*id.* at 3637), October 2 (*id.* at 3582); October 31 (*id.* at 3572); December 17 (*id.* at 3565);

● **2009**: January 12 (*id.* at 1108); March 23 (*id.* at 1098); April 2 (*id.* at 1094); April 13 (*id.*

at 1093); April 30 (*id.* at 1090); April 20 (*id.* at 1091); July 19 (*id.* at 1079);

● **2010-2016**: September 29, 2010 (*id.* at 1014), January 27, 2012 (*id.* at 928), January 30, 2012 (*id.* at 929), February 23, 2012 (*id.* at 1105); April 2, 2012 (*id.* at 913), April 25 2012 (*id.* at 1943), May 30, 2012 (*id.* at 902), June 26, 2012 (*id.* at 898), August 2, 2012 (*id.* at 890), November 1, 2012 (*id.* at 866), November 27, 2012 (*id.* at 862), December 13, 2012 (*id.* at 859), January 11, 2013 (*id.* at 858), February 4, 2013 (*id.* at 851), March 11, 2013 (*id.* at 839), March 31, 2013 (*id.* at 838) April 6, 2013 (*id.* at 837), April 8, 2013 (*id.* at 833), August 6, 2013 (*id.* at 823), January 10, 2014 (*id.* at 807, 182), January 19, 2014 (*id.* at 796), April 19, 2014 (*id.* at 796), February 2, 2015 (*id.* at 778), November 2, 2015 (*id.* at 771), and November 1, 2016 (*id.* at 1943).

### 3. Discussion Relating to Petitioner's Entitlement to Equitable Tolling

Again, just to reiterate its previous findings mentioned above, the Court has found that the instant federal petition filed on October 21, 2015 is untimely by nine years. Petitioner could be entitled to equitable tolling if his untimeliness was caused by extraordinary circumstances beyond his control. Specifically, his alleged blindness could have contributed to his failure to file his federal habeas during the relevant time-frame: between October 12, 2005 and October 12, 2006.

In his renewed motion to dismiss, Respondent argues that Petitioner cannot demonstrate that his alleged blindness prevented him from filing a timely petition, or that he pursued his rights diligently. Dkt. 30 at 24-29. The Court agrees as explained below.

### a. Petitioner's Failure to Show Entitlement to Equitable Tolling Based on His Alleged Blindness

First, the Court finds that Petitioner has failed to meet his burden of showing that he is entitled to equitable tolling based on his alleged blindness, and that it need not develop the record further because the record now contains sufficient "countervailing evidence" pursuant to *Laws* that rebuts any claim of alleged blindness during the relevant time-frame.

The record outlined above shows that Petitioner was not diagnosed as blind until June 7, 2010, when it was first determined that he met the criteria for Disability Placement due to blindness. *See* Resp't Ex. A at 1533, 1030. Thus, Petitioner's diagnosis of blindness in ***2010*** could not have prevented him from filing his petition during the relevant time-frame from October

12, **2005** to October 12, **2006**. *See Orthel v. Yates*, 795 F.3d 935, 939-41 (9th Cir. 2015) (evaluating alleged impairment during the year after which the state judgment became final); *Gaston v. Palmer*, 417 F.3d at 1035 (same). While, it is true that his medical records show that Petitioner had blurry vision in October and December 2009, leading his doctor to recommend surgery and warn of a "High Risk of Blindness" in January 2010. Resp't Ex. A at 2093, 529, 1059, 1056. However, this vision loss commenced **three years** after the AEDPA statute of limitations expired. Even assuming arguendo that Petitioner was blind by October 2009 (eight months before it was confirmed by his doctor on June 7, 2010), that would not assist Petitioner because the limitations period **expired** on October 12, 2006.

The Court further notes that Petitioner's earlier claims of being "Blind/Vision Impaired" in November 2002, s*ee* Resp't Ex. A at 1219, 1580, were unsupported and doctors noted that there was "[n]o documentation" and "no clinical or objective evaluation" for such allegations, *id.*

The Court also points out that directly prior to and during the relevant 2005-2006 time-frame, the record shows that Petitioner was able to play "8 games of basketball" in May 2004, to exercise and run every morning in August 2004, to work out and jog every day in late December 2004, and to play football in February 2005. *Id.* at 1164, 1197, 3003.

The record shows that Petitioner was diagnosed with diabetic retinopathy in August 2004, but the referring doctor noted that the clarity or sharpness of Petitioner's vision was "still good." *Id.* at 2301. Even if Petitioner made some eye complaints in September 2004, the record shows that he was referred to a retinologist. *Id.* at 2297. At that time, the doctor noted a diagnosis of "proliferative retinopathy" and made further medical referrals, but nothing in the record indicates that Petitioner was diagnosed as blind. *Id.* Instead, as explained above, the record shows that Petitioner was able to exercise regularly, to follow-up on any medical ailments, and to pursue certain legal matters as he indicated he was "fighting his 3 strikes" in late December 2004. *See id.* at 3003. Furthermore, in May 2005, Petitioner stated that "he **DOES NOT** have a disability (vision/hearing) and **DOES NOT** require staff assistance, i.e. written hearing or sign language-interpreter." Resp't Ex. B, Rules Violations Report, Dkt. 30-20 at 8 (emphasis in original).

The record shows that in late December 2005, Petitioner reported that he was taking and

doing well in his GED classes.  Resp't Ex. A at 2908.

      In December 2005, May 2006, and September 9, 2006, Petitioner had "chronic care" follow-up visits, and the reports linked to those visits did not include any visual impairment under his "chronic diseases."  *Id.* 1163, 3658, 3696.

      In 2006, Petitioner participated in various court appearances, including: a February 2006 court appearance related to having had a controlled substance; *id.* at 2888, being charged with having a controlled substance for sale/distribution and attending court to be sentenced for that charge in April 2006, *id.* at 2863, 2865; and losing his appeals in the California Supreme Court and in federal court in July 2006, *id.* at 2827, 2830.

      In July 2006, a doctor classified Petitioner's diabetes as "high risk," and Petitioner reported that he was experiencing loss of vision.  *Id.* at 2821, 3667.  However, the record shows that Petitioner was immediately examined by ophthalmology, *id.* at 3667, and that Petitioner's doctor requested an urgent consultation with a retinologist, noting Petitioner had a background of diabetic retinopathy, *id.* at 2245.  By early August 2006, Petitioner reported that he thought his diabetes was stabilizing.  *Id.* at 2818.

      Thereafter, in November and December 2006, Petitioner did not seem to have any pressing problems with his vision as he refused two scheduled appointments with a retinologist.  *Id.* at 2245, 2245, 2232.

      In sum, Petitioner fails to show that he was blind or that his vision impairment was so severe from October 12, 2005 to October 12, 2006 that he was unable to timely file his federal petition or to prepare the petition during that relevant time-frame.  Similarly, the record shows that because Petitioner was receiving treatment for his alleged vision impairments, he was able to function within normal limits and there is nothing in the record that shows that his vision impairments rendered him unable to prepare and timely file his federal petition.  Therefore, the record contains sufficient countervailing evidence that indicates that Petitioner's vision impairments were being treated and any alleged blindness did not occur during the relevant time frame from October 12, 2005 to October 12, 2006, and that he was functional enough to file a timely federal petition.

United States District Court
Northern District of California

### b. Petitioner's Failure to Show He Pursued His Rights Diligently

Second, the Court finds that Petitioner cannot demonstrate that he had been diligently pursuing his rights despite his alleged blindness. Although the records demonstrate that Petitioner requested medical treatment or accommodation as his vision worsened, there is no record that Petitioner requested but failed to receive assistance related to filing his federal petition, at any point.

Prior to Petitioner's confirmed blindness in 2010, there is no indication that he was denied the resources to file his federal petition. To the contrary, the record suggests Petitioner could have pursued the federal petition but simply failed to do so. For example, Petitioner was charged with drug trafficking on November 10, 2005 and pled guilty to a related crime on April 14, 2006, suggesting he had access to counsel while the limitations period was running. *See Orthel*, 795 F.3d at 93, fn. 3 (noting that Petitioner could not show diligence because his "participation in litigation in 2001 indicates that counsel may have been reasonably available"). Moreover, Petitioner's following actions in 2006 indicated that he was pursuing various legal cases: he referenced the loss of his appeal in the California Supreme Court on July 5, 2006, *id.* at 2830, 2837; and he told a social worker he would continue to fight his initial sentence on April 14, 2006, *id.* at 2863.

Finally, Petitioner's consistent refusal of medical treatment undercuts any suggestion that he diligently pursued his rights. The record shows that Petitioner was advised as early as January 2006 that refusing treatment for diabetes could lead to eye disease or vision problems. *See* Resp't Ex. A at 2272, 2266; *id.* at 1975-1978, 1960-1961 (2011 refusal forms); *see also id.* at 753 (August 23, 2016 advisement of long-term consequences of diabetes, including the potential for blindness). Having frequently refused diabetes treatment despite knowing that doing so could have severe medical consequences, including blindness or death, Petitioner cannot claim now that he was "'diligent in his efforts to pursue his appeal at the time his efforts were being thwarted.' [Citation.]" *Gibbs v. LeGrand*, 767 F.3d 879, 892 (9th Cir. 2015), emphasis in original; *see also id.* ("[D]iligence during the existence of an extraordinary circumstance is the key consideration."); *Yeh v. Martel*, 751 F.3d at 1078 (emphasizing "stringency of the overall equitable tolling test: the

mental impairment must be so debilitating that it is the but-for cause of the delay, and even in cases of debilitating impairment the petitioner must still demonstrate diligence.").

Accordingly, because Petitioner cannot demonstrate that blindness prevented him from timely filing his petition, or that he diligently pursued his rights despite his worsening vision, he cannot demonstrate that he is entitled to equitable tolling during the relevant time period of October 12, 2005 through October 12, 2006. Therefore, Respondent's renewed motion to dismiss is GRANTED. Dkt. 30.

## IV.    CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners have been amended to require a district court that dismisses or denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

For the reasons stated above, Petitioner has not shown "that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a COA is DENIED.

## V.    CONCLUSION

For the reasons stated above, the Court orders as follows:

1.      Respondent's renewed motion to dismiss petition is GRANTED, and the petition is DISMISSED with prejudice. Dkt. 30.

2.      A certificate of appealability is DENIED. Petitioner may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

3.      The Clerk of the Court shall terminate all pending motions and close the file.

4.      This Order terminates Docket No. 30.

IT IS SO ORDERED.

Dated: January 5, 2018

_____
YVONNE GONZALEZ ROGERS
United States District Judge